LHT



# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA

JERRY TRULL, et al.,

       Plaintiffs,

vs.

DAYCO PRODUCTS, INC., et al.,

       Defendants.

Civil Action No. 1:02-cv-243

Honorable Lacy H. Thornburg

Class Action

## DEFENDANTS' TRIAL BRIEF

### July 6, 2004

# TABLE OF CONTENTS

Page

I.  INTRODUCTION...................................................................................... 1

II.  CLAIMS.................................................................................................. 1

III.  LAWS AND CONTENTIONS ............................................................... 2

    A.    Claims for Breach of Contract/Breach of
          ERISA Benefit Plan ........................................................................ 3

        1.    General rules on vesting............................................... 3

        2.    Elements of proof........................................................ 5

        3.    Test for establishing that there was
            an "agreement" ........................................................... 6

        4.    Test for establishing a breach...................................... 7

        5.    Certainty of obligation ................................................ 8

        6.    Difference between "lifetime" benefits
            and "vested" benefits .................................................. 8

        7.    Applicable rules of contract construction.................... 9

        8.    Extrinsic evidence ...................................................... 10

        9.    Past practice................................................................ 12

        10.    Refusal to bargain versus vesting............................... 14

        11.    Admissions/acts of Union agents ............................... 15

        12.    FASB "liabilities" and "obligations".......................... 15

        13.    Company's contentions............................................... 16

            a.    Pre-1992 Memorandum of Agreement Retirees ............. 16

            b.    Post-1992 Memorandum of Agreement/
                Pre-1995 Retirees ....................................................... 16

i

|  |  | c. | Post 1995 Retirees | 17 |
| B. | | Statute of Limitations | | 17 |
|  | 1. | | Applicable law | 17 |
|  | 2. | | Applicable limitations period | 18 |
|  | 3. | | Accrual | 18 |
|  | 4. | | Elements of proof | 19 |
|  | 5. | | Defendants' contentions | 19 |
| C. | | Claim for Breach of Fiduciary Duty Under ERISA | | 20 |
| D. | | Damages | | 20 |
| E. | | Questions for Court Versus Questions for the Jury | | 21 |
| F. | | Evidentiary Issues | | 22 |
| G. | | Standards for Directed Verdict | | 26 |
| VI. | CONCLUSION | | | 27 |

# I. INTRODUCTION

This case arises from Mark IV's implementation of cost caps with respect to retiree health insurance. Plaintiffs claim that the implementation of these cost caps violated their rights under a series of collectively bargained insurance agreements. Although the agreements have expired Plaintiffs claim that the contracts created a "vested" right to health insurance benefits, which survived the expiration of the agreements. Plaintiffs further assert that their rights were vested at whatever level was in effect when they retired. As to persons retiring during the term of the "1995 Insurance Agreement," Plaintiffs acknowledge that cost caps were already in effect when they retired. However, they claim that the Company agreed to increase the caps by 5% for each year of the 1995 contract. In addition they assert that the Company violated its fiduciary duty under ERISA by not being a prudent shopper of health care benefits.

Per the Court's request this brief will not attempt to repeat the evidence and arguments, as set forth in the parties' earlier briefs. Instead, this brief will attempt to provide the court with an "executive summary" regarding the issues to be tried, the law applicable to those issues and the Defendant's contentions with respect to each such issue. In addition, this brief will address certain evidentiary issues and will provide the legal authorities for Defendant's proposed jury instructions.

# II. CLAIMS

Counts I through VI assert claims for breach of contract under the LMRA and breach of employee benefit plans under ERISA. Count VII asserts a claim for breach of fiduciary duty under ERISA . Counts I through VI are essentially the same claims, except that they are being asserted under different statutes and are asserting different breaches of contract.

1

With respect to those persons retiring prior to 1995 ("Subclass A"), Plaintiffs assert in Counts I and II, that the Company had no right to impose cost caps. With respect to those who retired under the 1995 Insurance Agreement (Subclass B), Plaintiffs Complaint does not challenge the Company's right to impose cost caps. Instead, it claims that the Company breached the terms of the 1995 Agreement by (1) failing to increase the cost caps by 5% per year over the life of the contract (Counts III and IV); and (2) by failing to apply their prescription drug co-pays to their annual out-of-pocket maximum (Counts V and VI.) In addition, Plaintiffs assert that the Company breached its fiduciary duty by renewing its contracts with UHC without adequate investigation as to whether the rates offered by UHC were reasonable. (Count VII.)

## III.    LAW AND CONTENTIONS

To prevail on their claims for breach of contract/breach of ERISA benefit plan, Plaintiffs must overcome a strong presumption that retiree health insurance benefits are not vested. *District 17 United Mine Workers v. Allied Corp.*, 735 F.2d 121, 127 (4th Cir. 1984); *see also Gable v. Sweetheart Cup Co.*, 35 F.3d 851, 855 (4th Cir. 1994); *Pierce v. Sec. Trust Life Ins. Co.*, 979 F.2d 23, 24 (4th Cir. 1992); *District 29, United Mineworkers v. Royal Coal Co.*, 768 F.2d 588, 590 (4th Cir. 1985); *District 17, United Mineworkers v. Allied Corp.*, 735 F.2d 121, 127 (4th Cir. 1984); *Arens v. DeFries*, No. WN-93-1796, 1994 U.S. Dist. LEXIS 20726 (D. Md. Aug. 19, 1994) (unpublished). In addition they must show that they brought their claims in a timely fashion. With respect to their claim for breach of fiduciary duty they must not only establish that the selection of providers is a fiduciary function, but must also show that the Company acted unreasonably in making such selection decisions. Based on the evidence that will be presented at trial, Plaintiffs will be unable to meet their burden.

2

## A.  Claims for Breach of Contract/Breach of ERISA Benefit Plan

Under federal common law an employer is obligated to provide health insurance benefits in accordance with the terms of its collective bargaining agreement. *District 29, United Mineworkers v. Royal Coal Co.*, 768 F.2d 588, 590 (4th Cir. 1985); *District 17, United Mineworkers v. Allied Corp.*, 735 F.2d 121, 127 (4th Cir. 1984); *Arens v. DeFries*, No. WN-93-1796, 1994 U.S. Dist. LEXIS 20726 (D. Md. Aug. 19, 1994) (unpublished).  Under ERISA an employer is also required to provide benefits in accordance with the terms of its employee benefit plan. *Gable v. Sweetheart Cup Co.*, 35 F.3d 851, 855 (4th Cir. 1994); *Pierce v. Sec. Trust Life Ins. Co.*, 979 F.2d 23, 24 (4th Cir. 1992); *see also* ERISA 29 U.S.C.§ 1132(a).  However, the law does not require an employer to make an agreement to provide health care benefits or require an employer to establish an employee benefit plan. *See Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996) ("nothing in ERISA requires employers to establish employee benefit plans").  The law only requires an employer to provide the benefits that the employer has agreed to provide in its contract or benefit plan documents, no more and no less. *See id.*

### 1.  General rules on vesting

With respect to retiree health insurance, the law distinguishes between vested and non-vested benefits. *District 17 United Mine Workers v. Allied Corp.*, 735 F.2d 121, 127 (4th Cir. 1984); *see also  Gable v. Sweetheart Cup Co.*, 35 F.3d 851, 855 (4th Cir. 1994); *Pierce v. Sec. Trust Life Ins. Co.*, 979 F.2d 23, 24 (4th Cir. 1992); *District 29, United Mineworkers v. Royal Coal Co.*, 768 F.2d 588, 590 (4th Cir. 1985); *District 17, United Mineworkers v. Allied Corp.*, 735 F.2d 121, 127 (4th Cir. 1984); *Arens v. DeFries*, No. WN-93-1796, 1994 U.S. Dist. LEXIS 20726 (D. Md. Aug. 19, 1994) (unpublished).  In the context of a collectively bargained health insurance plan, a vested benefit is one that is guaranteed beyond the expiration of a collective

bargaining agreement and is not subject to modification or termination even after the collective bargaining agreement has expired. *See, e.g., Keffer v. H.K. Porter Co., Inc.*, 872 F.2d 60, 63 (4th Cir. 1989) (health care benefits found to survive the expiration of a collective bargaining agreement where that agreement stated that retirees would receive benefits "notwithstanding the expiration of this agreement"). A non-vested benefit is one that is guaranteed only for the duration of the collective bargaining and is subject to modification or termination after the agreement has expired. *E.g., District 29, United Mineworkers v. Royal Coal Co.*, 768 F.2d 588, 590 (4th Cir. 1985); *District 17, United Mineworkers v. Allied Corp.*, 735 F.2d 121, 127 (4th Cir. 1984); *Arens v. DeFries*, No. WN-93-1796, 1994 U.S. Dist. LEXIS 20726 (D. Md. Aug. 19, 1994) (unpublished).

As general rule, the health insurance benefits created by a collective bargaining agreement are not "vested" and "do not survive the expiration of the agreement." *District 17 United Mine Workers v. Allied Corp.*, 735 F.2d 121, 127 (4th Cir. 1984); *see also Gable v. Sweetheart Cup Co.*, 35 F.3d 851, 855 (4th Cir. 1994); *Pierce v. Sec. Trust Life Ins. Co.*, 979 F.2d 23, 24 (4th Cir. 1992); *District 29, United Mineworkers v. Royal Coal Co.*, 768 F.2d 588, 590 (4th Cir. 1985); *Arens v. DeFries*, No. WN-93-1796, 1994 U.S. Dist. LEXIS 20726 (D. Md. Aug. 19, 1994) (unpublished). Accordingly, an agreement that such benefits will be vested must be must be "clearly" stated. *Allied Corp.*, 735 F.2d at 127; *see also District 29, United Mineworkers v. Royal Coal Co.*, 768 F.2d 588, 590 (4th Cir. 1985); *District 17, United Mineworkers v. Allied Corp.*, 735 F.2d 121, 127 (4th Cir. 1984); *Arens v. DeFries*, No. WN-93-1796, 1994 U.S. Dist. LEXIS 20726 (D. Md. Aug. 19, 1994) (unpublished).

Similarly, under ERISA, there is no presumption that health insurance benefits are vested; instead it is presumed that health insurance benefits are not vested. *Gable v. Sweetheart*

*Cup Co.*, 35 F.3d 851, 855 (4th Cir. 1994); *Pierce v. Sec. Trust Life Ins. Co.*, 979 F.2d 23, 24 (4th Cir. 1992); *see also Howe v. Varity Corp.*, 896 F.2d 107, 1109 (8th Cir. 1990) (holding that ERISA's mandatory vesting requirements do not apply to welfare benefits). Accordingly, any waiver of the employer's right to modify and to terminate benefits must be clearly stated. *Gable v. Sweetheart Cup Co.*, 35 F.3d 851, 855 (4th Cir. 1994); *Pierce v. Sec. Trust Life Ins. Co.*, 979 F.2d 23, 24 (4th Cir. 1992); *See also In Re White Farm Equipment Co.*, 788 F.2d 1186, 1193 (6th Cir. 1986) (holding that vested welfare benefits must be described in written "plan documents"). The purpose of these rules is to encourage employers to provide health care benefits. *See Gable*, 35 F.3d at 859 (holding that mandatory vesting of welfare benefits "would seriously complicate the administration and cost of plans").

### 2.    Elements of proof

In this case Plaintiffs claim that the insurance agreements created a "vested" right to health insurance benefits, which were not guaranteed for the duration of the agreement, but were guaranteed beyond the expiration of the collective bargaining agreements. (*See* Second Amended Complaint at ¶ 23; Declaration of Earl Johnson at ¶ 6.) Plaintiffs further assert that their rights were guaranteed or vested at the level in effect when they retired. (*See* Second Amended Complaint at ¶ 22.) To prevail on these claims Plaintiffs must prove that: (1) there was an agreement between the Company and the Union as to whether retiree health insurance benefits would or would not be vested; (2) the agreement was that benefits would be vested; (3) the caps imposed by the Company were in violation of the agreement; and (4) the Plaintiffs have suffered damages. *See Gable*, 35 F.3d at 856 (plaintiffs have "burden of proving that their health insurance benefits were vested"); *Local 150, United Food & Commercial Workers v. Dubuque Packing Co.*, 756 F.2d 66, 70 (8th Cir. 1985) ("the burden is on the plaintiffs to show that the

parties intended retirees' benefits would be vested and not tied to the agreement which created them"); *United Paperworkers International Union v. Jefferson Smurfit Corp.*, 771 F. Supp. 992, 994 (E.D. Mo. 1991) ("plaintiff bears the burden of showing that the parties intended retirees' benefits would be vested"); *see generally Eli Research, Inc. v. United Communications Group*, 312 F.Supp.2d 748, 755 (M.D.N.C. 2004) (holding that "the essential elements for a breach of contract claim are the existence of a valid contract and a breach of the terms of that contract); *Interstate Narrow Fabrics, Inc. v. Century USA, Inc.* 218 FRD 455, 462 (M.D.N.C. 2003) ("under North Carolina law, the elements of a breach of contract claim are (1) the existence of a valid contract; and (2) the breach of the terms of that contract). Plaintiffs will be entitled to a verdict in their favor only if they establish each of these elements by a preponderance of the evidence. The Company will be entitled to a verdict in its favor if the Plaintiffs fail to establish any one of these elements.

### 3. Test for establishing that there was an "agreement"

To establish that there was an agreement between the Company and the Union as to any of the issues in this case, Plaintiffs must show that the Company and the Union reached a "meeting of the minds" on that particular issue. 17A AM. JUR. 2D, *Contracts* § 26 (1991)("There must be mutual assent or a meeting of the minds on all essential elements or terms in order to form a binding contract"). A meeting of the minds occurs when both parties have manifested or expressed their assent to a particular term and condition of the contract. *Id.*

When determining whether a party intended to assent to a particular term of agreement, the courts employ an "objective test," looking to a party's outward expressions of intent rather than other forms of unexpressed intent. 17A AM. JUR. 2D *Contracts* § 347 (1991); *see also Princess Cruises v. General Electric Co.*, 143 F.3d 828, 834 (4th Cir. 1998) ("in evaluating a

6

parties intent, we must examine his outward expression rather than his secret, unexpressed intention); *Silicon Image v. Genesis Microchip*, 271 F.Supp.2d 840, 850 (E.D. Va. 2003) (court must look to "objective manifestations" of parties' intent). A secret understanding or one that is not expressed is not binding.

"Where there is . . . a misunderstanding as to the terms of a contract," no contract exists. 17A AM. JUR. 2d, *Contracts* § 31. Similarly, when the circumstances disclose a latent ambiguity in the meaning of an essential word "by which one of the parties meant one thing and another a different thing, the difference going to the essence of the supposed contract, the result is that there is no contract." *Id.*

### 4.    Test for establishing a breach

To establish a breach of the agreement it is not enough for the Plaintiffs to show that their benefits were vested. Instead, the Plaintiffs must also show that the contract prohibited the company from imposing cost caps. *See, e.g., Diehl v. Twin Disc, Inc.*, 102 F.3d 301, 309-11 (7th Cir. 1999) (even though plaintiffs had a "vested right to life and medical benefits for life," remand was required for determination as to whether employer's "modifications" of such benefits violated plaintiffs' rights). In determining whether the contract prohibited the company from imposing cost caps it is necessary to consider whether the insurance agreement required the company to provide retiree health insurance benefits at "no cost," whether the company agreed to provide any specific level of benefits, whether a cap on company contributions would constitute a change in benefits and whether the parties actually agreed to the costs caps that are at issue.

## 5. Certainty of obligation

To be binding, a contract must be "sufficiently definite to enable the court to determine its exact meaning and fix definitely the legal liability of the parties."  17A AM. JUR. 2D, *Contracts* § 196 (1991).  Where a contract is "so vague and indefinite that the intention of the parties cannot be ascertained there from, it is unenforceable." *Id.*  As applied to this case, this means that the contract must be sufficiently definite, not only in terms of whether benefits were intended to be vested, but also in terms of whether the insurance agreement required the company to provide retiree health insurance benefits at "no cost,"  whether the company agreed to any specific level of benefits that would be provided, whether a cap on company contributions would constitute a change in benefits and whether the parties actually agreed to the costs caps that are at issue.  With respect to each such issue, the law does not allow the judge or the jury to make a contract for the parties. *See Showcase Woodworking, Ltd. v. Fluor Daniel, Inc.*, 1990 U.S. Dist. LEXIS 19614 at * 6 (E.D. Va. 1990) (unpublished) (court refused to find contract, or submit question to jury where no contract existed).

## 6. Difference between "lifetime" benefits and "vested" benefits

Agreeing to provide benefits "for life" or until "age 65," is not the same thing as agreeing that benefits are "vested."  *See Bidlack v. Wheelabrator Corp.*, 993  F.2d at 606-610 (agreeing to provide benefits to retirees once they "reach age 65" does not necessarily mean that such benefits "outlive the contract"); *Joyce v. Curtiss-Wright Corp*, 171 F.3d 130, 134 (2d Cir. 1999)(agreeing to provide benefits until "eligible for Medicare" does not mean that benefits were "vested"); *UAW v. Rockford Powertrain, Inc.*, 350 F.3d 698, 702 (7th Cir. 2003)(agreement to provide benefits "until death" does not preclude employer from later terminating such benefits); *Musto v. American General Corp.*, 86 F.2d 897, 908 at 6 (6th Cir. 1988) (referring to benefits as

being "lifetime" does not mean that Company does not have the right to amend or terminate benefits"); *Gable,* 35 F.3d at 855 ("it is well-established that ERISA does not prohibit a Company from terminating or modifying previously offered benefits that are not vested"); *Moore v. Metropolitan Life Insurance Co.*, 856 F.2d 488, 490 (2nd Cir. 1988) (holding that documents describing benefits as "lifetime" are not inconsistent with other documents reserving the employer's right to modify). Terms such as "for life" or until "age 65" often refer to the "duration of eligibility," as opposed to meaning that benefits are vested. *Arens v. DeFries*, No. WN-93-1796, 1994 U.S. Dist. LEXIS 20726 (D. Md. Aug. 19, 1994) (unpublished). Thus, even when an employer agrees to provide benefits for life or until age 65, the employer may still have the right to change those benefits or even to terminate those benefits. To prevail on their claim Plaintiffs must show that the Company and the Union intended benefits to be "vested" as opposed to simply intending that people would be "eligible" for benefits "until death" or until "age 65."

## 7. Applicable rules of contract construction

In determining whether the parties reached agreement on the issue of vesting and the level at which benefits would be vested, it is necessary to first consider the language of the written agreement. *See* 17A AM. JUR. 2d *Contracts* § 347 (1991). ("The object to be attained in construing a contract is to ascertain the meaning and intent of the parties as expressed in the language used"). This is especially true under ERISA, which requires that a welfare benefit plan must be in writing, and which " precludes oral modifications of [ERISA] plan[s]." *See* 29 U.S.C. §1102(A)(1); *Nachwalter v. Christie*, 805 F.2d 956, 960 (11th Cir. 1986); *see also Musto v. American General Corp.*, 861 F.2d 897, 910 (6th Cir. 1988); *Pierce v. Security Trust Life Insurance Co.*, 979 F.2d 23, 29 (4th Cir. 1992). The language of the agreement must be given its

ordinary meaning unless special meaning was intended. *See* 17 Am. Jur. 2D, *Contracts*, § 337 (1991); *United States Fidelity and Guaranty Co. v. Guenther*, 281 U.S. 34, 37 (1930). In addition, the terms of the written agreement must be read in conjunction with the other provisions of the agreement. *See* 17A Am. Jur. 2D *Contracts* § 385 (1991)("contract must be construed as a whole and that the intention of the parties is to be ascertained from the entire instrument"). To the extent that any provisions seem to be inconsistent, they must be read as being consistent to the extent practicable. *See* 17A Am. Jur. 2d *Contracts* § 384 (1991) ("all clauses and provisions of a contract should, if possible, be so construed as to harmonize with one another").

### 8. Extrinsic evidence

"A written agreement consummating previous oral and written negotiations is deemed, under the [parole evidence] rule, to embrace the entire agreement, and if the writing is clear and unambiguous, parole evidence will not be allowed to vary the contract." F. Elkouri & E. Elkouri, How Arbitration Works, *Use of Substantive Rules of Law,* 598 (5th ed. 1997); *see also Air Line Pilots Ass'n Int'l v. Midwest Express Airlines*, 279 F.3d 553, 557 (7th Cir. 2002)(under parol evidence rule, negotiating history cannot "be used to vary the terms of a written contract intended to be the final integrated expression of the parties' deal"); *Pace v. Honolulu Disposal Serv., Inc.*, 227 F.3d 1150, 1157-58 (9th Cir. 2000) ("Although parol evidence rule is not applied as strictly in the context of collective bargaining agreements, it still operates to bar extrinsic evidence of an agreement inconsistent with an unambiguous writing.") (footnotes omitted). In determining whether an agreement is ambiguous, the Court must look to the agreement itself, as opposed to any extrinsic evidence. *UAW v. Skinner Engine Co.*, 188 F.3d 130, 145 (3d Cir. 1999) (extrinsic evidence "may not be used to create an ambiguity" in the

10

contract where none exists); *accord Coleman v. Nat'l Life Ins. Co.,* 969 F.2d 54, 56 (4th Cir. 1992) ("In the absence of ambiguity, the Court's inquiry is limited to the terms of the written terms and conditions in the written plan").

If the Court determines, as a matter of law, that the agreement is ambiguous, then it is relevant to consider the circumstances surrounding the agreement. *See Paul Revere Life Ins. Co. v. Forester,* 32 F.Supp.2d 352, 355 (W.D.N.C. 1998). In the collective bargaining context, the relevant circumstances include: the proposals that were made during negotiations leading to the agreement, the statements that were made during such negotiations, the manner in which the Company estimated the cost of providing retiree health insurance benefits, whether the parties agreed to fund the benefits, whether the parties specifically described the benefits as being vested, the manner in which benefits were described in the tentative agreements, the manner in which benefits were described to union members during the contract ratification meetings, the manner in which the benefits were described in the summary plan descriptions and the manner in which the parties described other benefits in other documents. *See CSX Transportation, Inc. v. United Transportation Union,* 29 F.3d 931, 936 (4th Cir. 1994) (if the parties' written agreement is ambiguous, past practice in bargaining history may be used to "fill the gap"); *United Mine Workers of America v. Beth Energy Mines, Inc.,* 2001 WL 737558 (S.D. W.Va. 2001) ("in interpreting the language of a collective bargaining agreement the court may examine the structure of the contract, the bargaining history and the conduct of the parties; *see also Oil Chemical & Atomic Workers Union v. NLRB,* 842 F.2d 1141, 1144 (9th Cir. 1988) (in determining the intent of the parties to a collective bargaining agreement "relevant considerations include the bargaining history, the parties' interpretation of the contract, the conduct of the parties, and the legal context in which the contract was negotiated); *Northwest*

*Administrators, Inc. v. BV & BR, Inc.*, 813 F.2d 223, 226 (9th Cir. 1987) (evidence of the conduct of the parties during bargaining and contract formation is relevant and should be given great weight). Statements made to persons at the time of retirement are only relevant to the extent that the person making such statements had personal knowledge of what was agreed to during negotiations. *International Longshoremen's Association v. Delta Steamship Lines, Inc.*, 636 F. Supp. 722, 732 (S.D. N.Y. 1986) (in determining what agreement was reached during collective bargaining negotiations, relevant inquiry is the intent of the "parties who were involved in negotiating" the applicable agreement as derived from the testimony of those who were "present at the negotiations," those who were on the "negotiation team" and those who "observed the negotiations"); *see also* Fed. R. Evid. 602.

### 9. Past practice

In addition, it is relevant to consider the parties' past practices, to the extent that such practices are consistent or inconsistent with the positions they are asserting in the lawsuit. To be useful for purposes of interpreting a contract a past practice must be "(1) unequivocal; (2) clearly enunciated and acted upon; [and] (3) readily ascertainable over a reasonable period of time as a fixed, and established practice excepted by both Parties. F. ELKOURI & E. ELKOURI, HOW ARBITRATION WORKS, *Custom and Past Practice* 632 (5th ed. 1997). In addition, the contract must be susceptible to more than one reasonable interpretation. A past practice cannot be used to change the explicit words of a contract; nor can it be used to modify or add to the contract. *Id.* at 651-652.

Also, it is important to distinguish between conduct that is done because a party believes there is a contractual obligation to do so, and conduct that is done for other reasons. "The mere failure to exercise a legitimate function of management, is not a surrender of the right to start

exercising such right." *Id.* at 635; *see also Wyandotte Chemical Corp.*, 39 Lab. Arb. (BNA) 65, 67 (1962), (Mittenthal, Arb.) (company's practice of "assigning conversion work to yard department employees was not necessarily inconsistent with the Company's position that assignment of such work was within the Company's exercise of managerial discretion" and therefore not subject to unilateral discontinuation); *White Baking Co.*, 38 Lab. Arb. (BNA) 216, 217 (1962) (McIntosh, Arb.) (Company's practice of giving Christmas checks was not necessarily inconsistent with Company's position that the distribution of such checks was a "voluntary act" not subject to unilateral discontinuation); *Kennecott Copper Corp.*, 35 Lab. Arb. (BNA) 386, 388 (1960) (Updegraff, Arb.) (Company's past practice of payroll deductions was not inconsistent with the position that the making of such deductions was "optional and not subject to unilateral discontinuation").

Where successor employers are involved, it is necessary to determine whether the successor employer has agreed to abide by the past practices of the predecessor." F. ELKOURI & E. ELKOURI, *supra,* at 645. In making this determination it is necessary to consider all of the surrounding "circumstances." *Id.*

In this case, there is no dispute that Dayco continued to provide health insurance benefits to retirees, even after the collective bargaining agreements had expired. In addition, it was Dayco's general practice, but not consistent practice, to provide the same level of benefits that were in effect when a person retired. The question to be resolved is whether Dayco did these things because the Company believed it was contractually obligated to do so or did the company do so for other reasons? In addition, in must be determined whether Mark II agreed or did not agree to be bound by Dayco's past practices.

13

## 10. Refusal to bargain versus vesting

A common misunderstandings regarding retiree health insurance is that employers and unions are legally precluded from bargaining with respect to benefits for existing retirees. That is not the law. Under the National Labor Relations Act, employers are obligated to bargain with unions regarding the terms and conditions of employment for employees and future retirees. 29 U.S.C. § 185; *Fibreboard Paper Products Corp. v.* NLRB, 379 U.S. 203, 238 (1964). These are known as "mandatory subjects of bargaining." With respect to existing retirees, employers are not obligated to bargain, but that does not mean that they are prohibited from bargaining. *See Allied Chem and Alkali Workers v. Pittsburgh Plate Glass,* 404 U.S. 157, (1971). It simply means that bargaining with respect to existing retirees is a "permissive," as opposed to being a "mandatory" subject of bargaining.

Accordingly, when a union makes a proposal to change benefits for existing retirees, the employer may consider that proposal and may even agree to that proposal. On the other hand, the employer may refuse to even consider the proposal, and this is true regardless of whether benefits are vested or not. When an employer refuses to consider proposals to change benefits for existing retirees, that does not mean that benefits are vested; it simply means that the employer is exercising its right to bargain only as to employees and future retirees.

In the present case, the evidence will show that from time to time-to-time the Company took the position that it would not or could not entertain any proposals with respect to existing retirees. The question to be resolved is whether the Company took that position because benefits were vested, or simply because the Company was exercising it's right to bargain only as to employees and future retirees.

14

### 11. Admissions/acts of Union agents

"When a union is bargaining with management, it acts in a representative capacity, and on behalf of workers within the bargaining unit." *Garrish v. UAW*, 133 F. Supp. 2d 959, 967 (E.D. Mich. 2001). Accordingly, Plaintiffs are bound by the contracts and statements made by their union representatives. *Id.; see also Saboroski v. Pittsburgh Press Co.*, 188 F.3d 163, 168 (3d Cir. 1999) ("all terms of a collective bargaining agreement . . . are binding on the individual employees represented by the union"); *Pryner v. Tractor Supply Co.*, 109 F.3d 354, 362 (7th Cir. 1997) ("agreement negotiated by the union elected by a majority of the workers in the bargaining unit binds all members of the unit"); *Michota v. Anhuiser Busch, Inc.*, 755 F.2d 330, 335 (3d Cir. 1985) ("ability of duly elected bargaining representatives to bargain effectively in dependent in part upon its ability to bind the employees it represents to the terms of a negotiated agreement"); *NLRB v. Ellis Chalmers Mfg. Co.*, 388 U.S. 175, 180 (1967) ("employee may disagree with many of the union decisions but is bound by them"); *Baker v. Amsted Industries, Inc.*, 656 F.2d 1245, 1249 (7th Cir. 1981) ("even employees who may have preferred a different representative, or none at all, are bound by choice of a majority of their fellow workers"); *see generally* Fed R. Evid. 801(d)(2)(B), (C), and (D).

### 12. FASB "liabilities" and "obligations"

For accounting purposes the Federal Board of Accounting Standards has adopted rules regarding retiree health insurance. Under the FAS rules employers are required to report future health insurance expenses as being current liabilities or obligations. *See, e.g., International UAW v. Skinner Engine Co.*, 188 F.3d 130, 136 (3d Cir. 1999). This is true even if company has expressly reserved the right to modify and to terminate such benefits. The fact that a company

has reported it future retiree insurances expenses as being obligations or liabilities does not mean that such benefits are vested.

### 13. Company's contentions

Although the Plaintiffs have divided the class into two groups, there are actually three groups for purposes of assessing liability: (1) those who retired pre-1992 Memorandum of Agreement; (2) those who retired post-1992 Memorandum of Agreement, but pre-1995 agreement; and (3) those who retired post-1995. The evidence will show that the company had the right to impose cost caps as to all three groups of retirees.

#### a. Pre-1992 Memorandum of Agreement Retirees

With respect to persons who retired prior to the 1992 Memorandum of Agreement, the evidence will show that the Company and the Union never agreed that health in insurance benefits would be vested. Accordingly, as to persons that retired prior to 1992 Memorandum of Agreement, the Company had the absolute right to impose the cost caps that are at issue in this case.

#### b. Post-1992 Memorandum of Agreement/Pre-1995 Retirees

With respect to persons who retired during the term of the 1992 Memorandum of Agreement, but prior to 1995, the evidence will show that (1) not only was there no agreement between the Company and the Union that health in insurance benefits would be "vested"; but also, (2) the Company and the Union agreed that the Company's obligation would be capped at $1900 and $2800. Accordingly, as to persons that retired during the term of the 1990 Agreement, but after the Memorandum of Agreement, the Company had the absolute right to impose the cost caps that are at issue in this case. Moreover, even if the Company had agreed

16

that benefits would be vested, the Company still had the right to impose cost caps up to $1900 and $2800.

### c. Post 1995 Retirees

With respect to post-1995 retirees, the evidence will show that (1) not only was there no agreement between the Company and the Union that health in insurance benefits would be "vested"; but also, (2) the Company and the Union agreed that the Company's obligation would be capped at $1900 and $3500. Accordingly, as to persons that retired during the term of the 1995 Agreement, the Company had the absolute right to impose the cost caps that are at issue in this case. Moreover, even if the Company had agreed that benefits would be vested, the Company still had the right to impose cost caps up to $1900 and $3500.

## B. Statute Of Limitations

Even when a breach of contract has occurred, the party suing to address the breach of contract must do so within the applicable statute of limitations. If the plaintiff does not sue within the applicable limitations period, the claim is barred.

### 1. Applicable law

Because there is no express statute of limitations for a breach of contract claim under ERISA or the LMRA, the Court must apply "the most closely analogous statute of limitations under state law." *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 158, 103 S. Ct. 2281 (1983) (LMRA claim); *Dameron v. Sinai Hosp. of Baltimore, Inc.*, 815 F.2d 975, 981 (4th Cir. 1987) (ERISA claim). For purposes of deciding when the statute begins to run, however, federal law is controlling. *See Cox v. Stanton*, 529 F.2d 47, 50 (4th Cir. 1975).

## 2. Applicable limitations period

In North Carolina, the statute of limitations in an action for breach of contract is three years. *Glover v. First Union Nat'l Bank*, 428 S.E.2d 206, 208 (N.C. App. 1993); *Wise v. Dallas & Mavis Forwarding Co.*, 753 F. Supp. 601, 606 (W.D. N.C. 1991). Here the plaintiffs are suing for breach of contract and breach of an ERISA benefit plan, which is analogous to a claim for breach of contract. Accordingly, the three year limitations period would apply.

## 3. Accrual

Under federal law, the statute of limitations begins to run "when a plaintiff becomes aware or reasonably should become aware of the facts underlying the claim." *Starr v. JCI Data Processing, Inc.*, 767 F. Supp. 633, 638 (D. N.J. 1991). *See also Cox v. Stanton*, 529 F.2d 47, 50 (4th Cir. 1975) ("federal law holds that the time of accrual is when the plaintiff knows, or has reason to know, of the injury which is the basis of the action"). Thus, in a claim for breach of contract the claim accrues "when the claimant discovers, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged violation." *Biros v. Spalding-Evenflo Co*, 934 F.2d 740, 743 (6th Cir. 1991) (citation omitted); *see also Ryder v. Phillip Morris, Inc.*, 946 F. Supp. 422, 428 (E.D. Va. 1996). Even when the time for performance has not yet arrived, a breach of contract may occur when the defendant gives notice of his intent its not to perform. *WEGCO, Inc. v. Griffin Serv., Inc.*, 19 Fed. Appx. 68, 2001 WL 1094959 (4th Cir., Sept. 19, 2001) (copy attached at Ex. 43.) In that situation, the claim accrues and the statute begins to run when the defendant gives notice of its intent, as opposed to when the impact of that intent is felt. *Id.*

18

## 4.  Elements of proof

To prevail on its statute of limitations defense the Company must establish that (1) the acts constituting the alleged breach occurred more than three years prior to commencing the lawsuit; and (2) the plaintiffs knew of should have known of such acts more than three years prior to the commencement of their suit.  If the Company establishes each of these elements, then the Company will be entitled to a verdict in its favor on the statute of limitations defense.  If the Company fails to establish either of these elements, than the Plaintiffs will be entitled to a finding in their favor on the statute of limitations defense.

## 5.  Defendants' contentions

In the present case, the evidence will show that the "alleged breach" had occurred with respect to the pre-Memorandum of Agreement retirees no later than December of 1992 when the company announced that the caps had been established.  Thus, as to the pre-Memorandum of Agreement retirees the statute of limitations began to run in December of 1992 and expired in December of 1995.  Given that the suit was not filed until November of 2001, it is clearly untimely as to the pre-Memorandum of Agreement retirees.

With respect to the post-Memorandum of Agreement/pre-1995 retirees, the evidence will show that the alleged breach occurred no late than February 1994, when the Company announced that the caps were in place and would be enforced as to all retirees, including those who had retired under the Memorandum of Agreement.  Thus, as to those retiring during the term of the 1992 Memorandum of Agreement, the statute of limitations began to run no later than February 1994, and expired no later than February 1997.  Given that suit was not filed until November of 2001, the suit is time barred.

Case 1:02-cv-00243-LHT   Document 137   Filed 07/07/04   Page 22 of 30

**C.      Claim for Breach Of Fiduciary Duty Under ERISA**

The facts and the law with respect to the breach of fiduciary duty claim are set forth in Defendants Proposed Finding of Fact and Conclusions of Law with respect to Count VII. Also included in the proposed findings are Defendant's contentions with respect to that claim. Accordingly, the information will not be repeated here.

**D.      Damages**

In a claim for breach of contract, damages are generally limited to the amounts owing under the contract. (*See* 22 Am. Jur. 2d Damages § 44 (2004) (contract damages are designed to protect a party's "expectation interest by attempting to put him in as good a position as he would have been had the contract not been performed"); *see also* ERISA Section 502, 29 U.S.C. § 1132(a)(1); *Williams v. UNUM Life Ins. Co. of America,* 940 F. Supp. 136, 138 (E.D. Va. 1996) (recognizing claims under Section 502 of ERISA as breach of contract actions). Accordingly, when an employer charges for retiree health insurance benefits beyond what the employer is entitled to charge, damages would be limited to the difference between what the company charged and what the company was entitled to charge. *See e.g., Reich v. Lancaster,* 55 F.3d 1034 (5th Cir. 1995) (upholding trial court's award of damages based on what plaintiffs were charged in excess of the correct price). Punitive damages and attorneys fees are not available under Section 301, unless such damages are provided for in the collective bargaining agreement. *Island Creek Coal Company v. District 28,* 29 F.3d 126, 130 (4th Cir. 1994) (refusing to uphold an award of punitive damages); *United Food and Commercial Workers Local 400 v. Marval Poultry Co.,* 876 F.2d 346, 350 (4th Cir. 1989) (refusing to award attorney's fees). Similarly under Section 502 of ERISA, "[e]xtra-contractual or punitive damages [are] generally not available in an action by a beneficiary." *Reinking v. Philadelphia American Life Ins. Co.,* 910

F.2d 1210, 1220 (4th Cir. 1990) (internal quotations omitted); *see also Tingler v. Unum Life Insurance Company of America*, 2003 U.S. Dist. LEXIS 5455 (S.D. W. Va. 2003) at *16 (granting defendant's motion to strike plaintiff's demand for extra-contractual and punitive damages); *Farrie v. Charles Town Races, Inc.*, 901 F. Supp. 1101, 1105-06 (N.D. W. Va. 1995) (same).

Attorney's fees are available under ERISA, but only at the court's discretion. 29 U.S.C. § 1132(g)(1). *See also Reinking, supra.* "The 4th Circuit has established five factors which a court must consider in exercising this discretion. These include: "degree of culpability or bad faith," relative "ability to pay" and the " relative merits of the parties positions." *Johannssen v. District No. 1-Pacific Coast District*, 292 F.3d 159, 178-79 (4th Cir. 2002).

In the present case, the evidence will show that the pre-1995 retirees have suffered no damages in that the company agreed not to charge them for their benefits during the pendency of this lawsuit. With respect to the post-1995 retirees the company has been charging, but only since October of 2003. Accordingly, any damages would be limited to the amounts charged since October, less the amounts that the company was entitled to charge. Plaintiffs would not entitled to extra-contractual damages on any of their claims in this lawsuit.

With respect to attorneys' fees, the evidence will show that the Union is largely at fault in this case, is already funding the entire lawsuit and is fully capable of paying it's own attorneys fees. Accordingly, even if Plaintiffs could prevail on any of their ERISA claims, an award of attorneys fees would still be inappropriate.

## E.    Questions for Court versus Questions for the Jury

The Company contends that Plaintiffs are not entitled to a jury on any of their claims. The Court has denied the Company's Motion to Strike Jury Demand, however, and as such the

jury will be asked to decide the breach of contract Counts I, III, and V over the Company's objection. The Court will decide the ERISA Counts, II, IV, VI, and VII, except that the jury's findings with respect to Counts I, III and V will be preclusive as to II, IV and VI.

During the final pre-trial conference the Court suggested the possibility of also submitting the breach of fiduciary duty claim (Count VII) to the jury on an "advisory" basis. If the Court submits the breach of fiduciary duty claim to the jury, even on an "advisory" basis, it would be necessary to instruct the jury regarding the law on breach of fiduciary duty, including what constitutes a fiduciary duty, what constitutes a breach of fiduciary duty, the standard of review, the factors to consider in determining whether the company has abused it's discretion, the test for establishing causation and the available remedies. Given that the instructions regarding breach of contract will be complicated, in and of themselves, Defendants submit that it would be confusing and prejudicial to also submit the breach of fiduciary duty claim to the jury, even on an "advisory" basis.

## F.    Evidentiary Issues

In addition to the issues that Defendant has already briefed in its Motion in Limine to Exclude Evidence (docket nos. 115 & 116); Defendant anticipates that it will object to Plaintiffs proposed ERISA, Stuart Wohl, expert and Plaintiffs' proposed collective bargaining expert, Professor Berkeley, on the grounds that their testimony does not meet the requirements of FRE 702 and *Daubert v. Merrel Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993).

Wohl is expected to testify that Mark IV violated "industry standards" by not requesting backup data from UHC regarding it's renewal rates. Under *Daubert,* 509 U.S. at 589, such testimony is "unreliable" and therefore inadmissible for several reasons: (1) Wohl cannot identify any "authoritative" literature on the topic of employer benefit procurement; (2) Wohl is unable to

22

identify any surveys, statistical studies, or other empirical data (published or otherwise) evidencing the existence of such an industry standard; (3) Wohl is unaware of any controlling governmental or community standards or guidelines governing employers' requests for renewal calculations; (4) he cannot identify any section of, or regulation pursuant to, ERISA that even addresses this topic; (5) Wohl admits there are occasions when an employer will be unable to obtain backup data even when requested; (6) Wohl admits that he sometimes has advised his own clients not to request renewal calculations from their insurers; (7) Wohl recognizes that different employers approach insurance procurement in different ways; and (8) Wohl's testimony exposes the "industry standard" described in his report as little more than his own personal perception. As such, his descriptions of "industry-wide standards" are pure speculation – *i.e.*, guesses about what other employers might do before they renew a health insurance contract. *See also, Oglesby v. General Motors Corporation*, 190 F.3d 244, 250 (4th Cir. 1999) ("a reliable expert opinion must be based on scientific technical or other specialized *knowledge* and not on belief or speculation"); *Superguide Corp. v. DirecTV Enterprises, Inc.*, 211 F.Supp 2d 725, 737 (W.D.N.C. 2002, Thornburg, J.) ("an expert's opinion should be excluded when it is based on assumptions which are speculative and are not supported by the record"); *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 201 (4th Cir. 2001) (holding that expert opinion may not be based on "belief or speculation"); *Smith v. Wyeth-Ayerst Laboratories Co.*, 278 F.Supp. 2d 684, 691 (W.D.N.C. 2003) ("speculation is not a reliable basis for expert opinion.")

The remainder of Wohl's testimony deals with the so-called "5%" escalator issue, and the amounts that the company would have charged to retirees assuming that the 5% escalator had been applied. This is nothing more than simple arithmetic and, therefore, is not beyond "the common knowledge of jurors." *Persinger v. Norfolk and Western Railway Co.*, 920 F.2d 1185,

1187 (4th Cir. 1990); *see also Scott v. Sears Roebuck & Co.,* 789 F.2d 1052, 1055 (4th Cir. 1986)("Testimony as to a matter which obviously is within the common knowledge of jurors...can be of no assistance"); *Peters v. Five Star Marine Service,* 898 F.2d 448, 450 (5th Cir. 1990)(where jury can "adeptly assess [a] situation using only their common experience and knowledge," expert testimony is unnecessary); *Andrews v. Metro North Commuter Railroad Co.,* 882 F.2d 705, 708 (2nd Cir. 1989) (holding that expert testimony is inadmissible where it is directed to "lay matters which a jury is capable of understanding and deciding without the expert's help").

> Professor Berkeley's expert report points to a passage in his book that states flatly:
>
> This "zipper clause" is often a management demand in an effort to foreclose later disputes over non-written agreements or practices that may have occurred . . . It is well established in industrial relations that a clearly established past practice has a legally binding effect on the parties in a collective bargaining contract . . . If one party engages in an act that is continuous, open, overt, unequivocal and clear, and that act is accepted, albeit tacitly, by the other side, a past practice may emerge that enjoys the same legal status as written contract language and give the saem rights.

(Berkeley Expert Report at p. 5.) Professor Berkeley relies upon this basic legal principal, together with an assumption based upon the alleged conduct of the parties, to support his conclusion that "both parties intended that retirees' rights to medical benefits would continue after each agreement terminated . . . [and that] the chosen level of retiree medical benefits were to continue into the future unchanged." (Berkeley Expert Report, p. 4.) Professor Berkeley's assertions are offered both as legal and factual conclusions, and as such, should be excluded under F.R.E. 702. *Appone v. Sunshine Biscuits, Inc.,* 809 F.2d 1210, 1218 (6th Cir. 1987) (in case involving retiree benefits under a collective bargaining agreement, upholding trial court's exclusion of expert testimony under F.R.E. 702 where it was offered to instruct the jury on the applicable principles of law); *see also U.S. v. Race,* 632 F.2d 1114, 1119 (4th Cir. 1980)

24

(reversing trial court's admission of expert testimony where contract language required no special expertise to interpret).  In essence, Professor Berkeley's testimony is offered to tell the jury what the law is and what decision to reach.  This would not "assist" the jury as required under F.R.E. 702; moreover, such testimony would usurp both the role of this Court in deciding matters of law and the role of the jury in deciding issues of fact.  Accordingly, Professor Berkeley's testimony and related expert report should be excluded.

With respect to his qualifications as an "expert," Professor Berkeley admits that he was involved with the negotiation of only one substantive agreement.  (Berkeley Dep., 13:25 – 14:4.) Although Professor Berkeley has served as an arbitrator in the past, he has not been involved in any case since 1999 and has never been involved in cases involving retiree benefits, generally, much less health and life benefits.  (Berkeley Dep., 23:6-8, 17-19.)  Aside from his book, Professor Berkeley did not identify any authoritative articles published by him on the collective bargaining process; nor has Professor Berkeley identified any publications by him specifically on the subjects of retiree benefits or health and life insurance benefits.  (*See generally* Berkeley Curriculum Vitae, Berkeley Dep.)  Tellingly and as noted in Professor Berkeley's expert report, his conclusions rely principally upon an assumption that these parties conducted themselves in a certain manner.  (*See, e.g.*, Berkeley expert report at p. 4, noting that he was "asked to assume that it was the practice of the parties when a new agreement was reached which reduced medical benefits for future retirees, to permit employees to enjoy the former package of benefits as long as they retired within two or three months of the new agreement").  Accordingly, Professor Berkeley does not properly qualify as an expert witness.  *See Daubert v. Merrel Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); *see also Oglesby v. General Motors Corp.*, 190 F.3d

244, 250 (4th Cir. 1999) ("a reliable expert opinion must be based on scientific technical or other specialized *knowledge* and not on belief or speculation").

## G.  Standards for Directed Verdict

Under Federal Rule of Civil Procedure 50(a), a trial judge must direct a verdict in favor of a moving party if "under the governing law there can but one reasonable conclusion as to the verdict." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511 (1986). Under that Rule "the case should be withdrawn from the jury when any verdict in favor of the non-moving party necessarily will be premised upon "speculation and conjecture." *Gairola v. Virginia Department of General Services*, 753 F.2d 1281, 1285 (4th Cir. 1985) *quoting Ford Motor Co. v. McDavid,* 259 F.2d 261, 266 (4th Cir. 1958). Thus, "the question is not whether there is no evidence, but whether there is sufficient evidence upon which a jury can properly proceed to reach a verdict, although a mere scintilla of evidence is not enough to defeat a motion for a directed verdict." *Id.* (citations omitted). *See also Wright & Miller,* Federal Practice and Procedure: Civil 2d § 2524 (holding that in deciding a motion for directed verdict "the question is not whether there is literally no evidence supporting the party against whom the motion is directed, but whether there is evidence upon which the jury properly could find a verdict for that party.") Based on the evidence to be presented in this case Defendants anticipate a motion for directed verdict at the close of proofs.

## VI.   CONCLUSION

Based on all of the foregoing, judgment should be granted in favor of Defendant as to all counts.

Respectfully submitted,

Date:  July _____, 2004

_John W. Allen /wwl_

L. Neal Ellis, Jr.
Hunton & Williams
One Hannover Square, Suite 1400
421 Fayetteville Street Mall
Raleigh, North Carolina 27601
(919) 899-3000

John W. Allen (P10120)
David E. Khorey (P37089)
Joseph J. Vogan (P29920)
Anthony R. Comden (P44958)
Varnum, Riddering, Schmidt & Howlett, LLP
Bridgewater Place, P.O. Box 352
333 Bridge Street, N.W.
Grand Rapids, Michigan 49501-0352
(616) 336-6000
(616) 336-7000 – fax

Attorneys for Defendants

1004326_5

27