



# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA

JERRY TRULL, et al.,

           **Plaintiffs,**

vs.

DAYCO PRODUCTS, INC., et al.,

           **Defendants.**

_____ /

Civil Action No. 1:02-cv-243

Honorable Lacy H. Thornburg

Class Action

---

## DEFENDANT MARK IV'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW AS TO PLAINTIFFS' COUNT VII (ERISA BREACH OF FIDUCIARY DUTY)

Defendant's Proposed Findings of Fact and Conclusions of Law as to Plaintiffs' claim of breach of fiduciary duty under ERISA are as follows:

### I.    INTRODUCTION

1.    On December 12, 2003 the Court granted Plaintiffs' Motion for Leave to File a Second Amended Complaint adding an entirely new cause of action at Count VII:  a claim for a breach of fiduciary duty under the Employee Retirement Income Security Act (ERISA).

2.    In this count, Plaintiffs contend that Mark IV Industries, Inc. failed to make a diligent effort in selecting a medical insurer and/or service provider and negotiating premiums thereby breaching its fiduciary duty to plan participants and beneficiaries.

3.    Specifically, Plaintiffs allege that Mark IV failed to make a "diligent effort to negotiate with United Health Care and other carriers for the lowest premiums consistent with the specified plan design and quality of medical year." (Second Amended Complaint ¶ 101).

1

Defendant's Proposed Findings of Fact and Conclusions of Law
as to Plaintiffs' Count VII (ERISA Breach of Fiduciary Duty)

*Trull, et al. v. Dayco Prods., LLC, et al.*
Case No. 1:02-cv-243

Case 1:02-cv-00243-LHT   Document 140   Filed 07/07/04   Page 1 of 11

4.     Plaintiffs claim that Mark IV simply agreed to pay the premiums demanded by these insurers and/or service providers "expecting that applications of 'caps' will cause all the excess cost to be paid by Waynesville retirees and spouses." (*Id.*)

5.     Plaintiffs additionally allege a conflict of interest on the part of Mark IV, asserting that whenever retirees or their family members forfeit their coverage because they cannot pay the cost of the premium over and above the cap, Mark IV supposedly saves money. (*Id.* at ¶ 102).

6.     The Company contends that even if decisions concerning the selection of insurers and/or service providers and negotiations of premiums are fiduciary functions, it has not "abused its discretion" with respect to these decisions and no breach of its fiduciary duty under ERISA exists.

## II.     FINDINGS OF FACT

7.     For purposes of providing the health care benefits described in the 1995 Insurance Agreement, the Company contracted with PHP, which later became UHC.

8.     PHP/UHC is specifically referred in the Insurance Agreement as being an approved provider.

9.     Since 1995 the Company has continued to renew its insurance agreements with UHC, except that in 1999, the Company began to self-fund the prescription drug program.

10.     The Company closed the Waynesville effective March 13, 1998.

11.     From time to time, the Company has issued Summary Plan Descriptions with respect to the retiree health insurance program. The Summary Plan Descriptions expressly reserve the Company's right to "modify or terminate the plan." In addition, the plan documents confer "discretionary authority" upon Mark IV as plan administrator.

2

Defendant's Proposed Findings of Fact and Conclusions of Law
as to Plaintiffs' Count VII (ERISA Breach of Fiduciary Duty)

*Trull, et al. v. Dayco Prods., LLC, et al.*
Case No. 1:02-cv-243

Case 1:02-cv-00243-LHT   Document 140   Filed 07/07/04   Page 2 of 11

12.  The closing of the Waynesville plant resulted in a change in the demographic makeup of the covered population from a mostly active to a mostly retiree group.

13.  In 1995, Mark IV obtained a rate commitment from its health care service provider. This agreement capped rate increases at 5% until the end of 1998.

14.  Due to the change in demographics, UHC proposed a 46% rate increase for 1998. Mark IV objected to that rate increase.

15.  As the result of Mark IV's objections, UHC withdrew its proposal for a 46% rate increase. Instead, UHC insisted on a 5% increase.

16.  For purposes of determining the amount of contributions owing by the UHC group, Mark IV has applied a family cost cap of 3.5 times the cost caps set forth in the 1995 Insurance Agreement. Use of the 3.5 multiplier results in a lower contribution by retirees.

17.  From time to time Mark IV has researched options to reduce costs for the UHC group of retirees, including a three tiered rate structure and the availability of "Medicare risk" HMO coverage.

18.  UHC has a contract with Mark IV to provide coverage for Mark IV's active workforce at Fayetteville, North Carolina. Although Mark IV's goal and benefits strategy is to bring all active employees into its self-insured program, Mark IV has maintained the UHC contract with respect to the Fayetteville employees so as not to jeopardize the UHC contract with respect to the Waynesville retirees. Mark IV has also subsidized the Fayetteville program.

19.  The Company has made efforts, in conjunction with its consultants, to develop premium rates in such a way that the Company "didn't have to bill anyone [i.e., retirees] needlessly."

3

Defendant's Proposed Findings of Fact and Conclusions of Law
as to Plaintiffs' Count VII (ERISA Breach of Fiduciary Duty)

*Trull, et al. v. Dayco Prods., LLC, et al.*
Case No. 1:02-cv-243

Case 1:02-cv-00243-LHT   Document 140   Filed 07/07/04   Page 3 of 11

20.     At regular intervals during the course of its relationship with insurers and/or service providers, Mark IV has attempted to negotiate to obtain further cost savings for the plan.

21.     Mark IV has consistently tried to "determine if there is a better or cheaper way of supplying...benefits."

22.     Even though Mark IV has not always been successful in obtaining cheaper rates through negotiation, it has negotiated from time to time with UHC.  Mark IV also examined explanations of rates from UHC.

23.     In an effort to explore other health care provider options, the Company issued a "request for proposal" in September of 2001, for purposes of selecting a new insurance carrier.

24.     Mark IV's objective in soliciting bids was to limited to administrative convenience.  Instead, the Company also wanted to "offer its retirees plan options that are less costly than many of the current programs."

25.     Upon receiving responses to the RFP, Mark IV performed a "side-by-side" comparison of the results.

26.     In making its selection, Mark IV considered several factors, including cost, quality and comprehensiveness of services.

27.     As an alternative to the current programs, Mark IV has offered retirees an opportunity to participate in a less costly program known as "The Silver Care" program.

28.     Many retirees have expressed a preference for the more expensive UHC program because of its network of providers.

29.     For purposes of providing the health care benefits described in the 1995 Insurance Agreement, Mark IV has few alternatives, other than UHC.

4

Defendant's Proposed Findings of Fact and Conclusions of Law
as to Plaintiffs' Count VII (ERISA Breach of Fiduciary Duty)

*Trull, et al. v. Dayco Prods., LLC, et al.*
Case No. 1:02-cv-243

Case 1:02-cv-00243-LHT   Document 140   Filed 07/07/04   Page 4 of 11

30.   In its investigation of alternative service providers, Company discovered that the alternate provider network did not include one of the largest hospitals in Western North Carolina.

31.   For purposes of negotiating cost Mark IV has little leverage with UHC. This is due not only to the preferences of the plan participants, but also is due to the demographics of the group and the rich level of benefits.

32.   From time to time, Mark IV has renewed its contracts with UHC without requesting backup data for UHC regarding its renewal rates, but this is not uncommon in the marketplace.

33.   There is no industry standard for determining when a benefit plan administrator should or should not request backup data regarding renewal rates.

34.   If Mark IV had requested backup data, there is no way of knowing whether UHC would have provided such data.

35.   If Mark IV had requested backup data, there is no way of knowing whether Mark IV would have been able to negotiate a lower rate.

36.   Plaintiffs have presented no evidence showing that they have suffered any damages as a result of Mark IV's benefit procurement decisions.

37.   During the 2003 time frame, Mark IV sought RFPs with respect to the prescription drug program. Using the responses to the RFPs, the Company switched its drug program to a different provider. This has resulted in lower costs to retirees.

### III.   CONCLUSIONS OF LAW

38.   Under ERISA a plan administrator is obligated to act reasonably and in good faith when exercising a "fiduciary function." However, the law does not allow the Court to review the

Defendant's Proposed Findings of Fact and Conclusions of Law
as to Plaintiffs' Count VII (ERISA Breach of Fiduciary Duty)

*Trull, et al. v. Dayco Prods., LLC, et al.*
Case No. 1:02-cv-243

decisions of a plan administrator with respect to "settlor"-type issues; nor does the law allow the court to "second guess" the decisions of a plan administrator even with respect to "administrative"-type functions. *See Bryant*, 774 F. Supp. at 1494 (rejecting further discovery on whether individual defendants "had a legitimate business reason" or a "self-interested one," because "the motivation of plan settler is not to be tested against fiduciary standards and is not subject to judicial second-guessing" and to conclude otherwise "would yield unintended and absurd results"); *see also Hickman v. Tosco Corp.*, 840 F.2d 564, 566 (8th Cir. 1988) ("ERISA does not require that 'day-to-day corporate business transactions, which may have a collateral effect on prospective, contingent employee benefits, be performed solely in the interest of plan participants'") (citations omitted); *Sutton v. Weirton Steel Division*, 724 F.2d 406, 411 (4th Cir. 1983) (an employer's decision "to renegotiate or amend . . . unfunded contingent benefits [was] not to be reviewed by fiduciary standards"). Instead, the scope of review is extremely narrow.

## A.    Elements of Proof

39.    To prevail on their claim for breach of fiduciary duty, the plaintiffs must establish each of the following elements by a preponderance of the evidence: (1) that the defendant was engaged in a "fiduciary" function; (2) that the Company failed to act reasonably and in good faith respect to that function; and (3) that the plaintiffs suffered some prejudice as a result of the Company's breach. Contrary to the Defendants' contention, in this Court's opinion denying Defendants' motion for summary judgment, the Court found that a company's procurement decisions are administrative, as opposed to settlor functions; however, the evidence does not support a finding that the Company acted unreasonably or in bad faith, nor does the evidence support a finding that Plaintiffs have suffered any prejudice as the result of the alleged breach.

6

Defendant's Proposed Findings of Fact and Conclusions of Law
as to Plaintiffs' Count VII (ERISA Breach of Fiduciary Duty)

*Trull, et al. v. Dayco Prods., LLC, et al.*
Case No. 1:02-cv-243

Case 1:02-cv-00243-LHT    Document 140    Filed 07/07/04    Page 6 of 11

**B.    Test for Establishing Breach of Fiduciary Duty**

40.    A fiduciary's decisions are "reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to…construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 956 (1989).

41.    "When, however, an ERISA plan provides the plan administrator with discretionary authority…, the administrator's decisions are reviewed by the courts only for abuse of discretion." *Bynum v. Cigna Health Care of North Carolina*, 287 F.3d 305, 311 (4th Cir. 2002).

42.    Under the "abuse of discretion" standard, courts will "not disturb the interpretation [of an ERISA fiduciary] if it is reasonable"  even if a court would "come to a different conclusion independently." *Doe v. Blue Cross and Blue Shield*, 3 F.3d 80, 85 (4th Cir. 1993).  *See also Holland v. Burlington Industries, Inc.*, 772 F.2d 1140, 1149 (4th Cir. 1985) (holding that courts may not substitute a reasonable interpretation by an ERISA fiduciary with an interpretation of their own).

43.    When deciding whether a fiduciary has abused its discretion, a court may consider such factors as (1) the language of the plan; (2) the purpose and goals of the plan; (3) the adequacy of the materials considered to make the decisions and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decision making process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; and (7) any external standard relevant to the exercise of discretion. *See Booth v. Wal-Mart Stores, Inc.*, 201 F.3d 335, 342 (4th Cir. 2000).

Defendant's Proposed Findings of Fact and Conclusions of Law
as to Plaintiffs' Count VII (ERISA Breach of Fiduciary Duty)

*Trull, et al. v. Dayco Prods., LLC, et al.*
Case No. 1:02-cv-243

44.     Even when conflicts of interest actually exist, deferential *Firestone* review, albeit

modified, is still appropriate.  *See Firestone*, 489 U.S. at 116 (recognizing that courts may

"adjust the abuse of discretion standard in the presence of a conflict of interest"); *Ellen v. Ellis*,

126 F.3d 228, 236 (4th Cir. 1997) (same); *Scipio v. United Nat. Bank Shares, Inc.*, 284 F.Supp.

2d 411, 418 (N.D. W.Va. 2003) (holding that where there is a conflict of interest "an automatic

adjustment to a near-*de novo* standard…is not the correct approach").

## C.     Test for Establishing Causation

45.     The existence of a fiduciary duty and a breach of that duty are not, by themselves,

sufficient to establish an actionable claim under ERISA.  To fully establish such a claim, a party

must demonstrate some sort of causal connection between the breach and some loss suffered by

that party: "if there are no provable losses resulting from a breach, then no monetary liability for

a 'loss' would be available under ERISA."  *Smith v. Sydnor*, 2000 U.S. Dist. LEXIS 20074 at *60

(E.D. Va. August 25, 2000).  *See also Silverman v. Mutual Benefit Life Ins. Co.*, 138 F.3d 98,

104 (2d Cir. 1998) (holding that "ERISA requires a plaintiff to demonstrate in a suit for

compensatory damages that the plan's losses 'resulted from' a [fiduciary's] breach"); *Herman v.*

*Mercantile Bank, N.A.*, 137 F.3d 584, 587 (8th Cir. 1998) (holding that breach of fiduciary duty

required proof of loss to health plan).

## D.     Applied

46.     In this case, the Company is entitled to an "abuse of discretion standard" under

*Firestone* because plan documents confer "discretionary authority" upon it as plan administrator.

Defendant's Proposed Findings of Fact and Conclusions of Law
as to Plaintiffs' Count VII (ERISA Breach of Fiduciary Duty)

*Trull, et al. v. Dayco Prods., LLC, et al.*
Case No. 1:02-cv-243

47.     As to whether the company abused it's discretion, none of the plan documents require the company to obtain bids or obtain back-up data prior to making a selection decision. Moreover, the 1995 Insurance Agreement specifically refers to UHC as the approved provider.

48.     Contrary to the opinion of Plaintiffs' expert, Stuart Wohl, there is no evidence to suggest an "industry standard" regarding employer requests for backup data. Rather, different employers may approach renewal rates in different ways based on the unique circumstances they face.

49.     Even if the Company had requested back up data, there is no evidence that UHC would have provided such data; nor is there any evidence that Mark IV could have negotiated a lower rate. On the contrary the circumstances suggest that Mark IV had little choice in the selection of providers. Any effort to question the rates may have not only been futile, but also counter-productive in that UHC may have chosen not to renew the contract, which would have deprived the retirees of their preferred network of providers.

50.     Mark IV did not simply accept the rates charged by UHC, but instead consulted with its consultants to determine whether any lower cost options were available. *See e.g., Nelson v. Pattern Makers Health Fund*, No. 87 C 20296, 1990 U.S. Dist. LEXIS 3106 (N.D. Ill. January 19, 1990) (no breach of fiduciary duty where the plan administrator "undertook a search of insurance agencies in order to determine the feasibility of substitute plans"); *Ellen v. Ellis*, 126 F.3d 228 (4th Cir. 1997) (no breach of fiduciary duty where plan administrator relied on the opinions of experts in making its decision). In addition, the company compared the UHC rates to the rates that were being charged to the other retiree groups and to the general trends in the industry. None of these factors gave any indication that UHC was overcharging.

9

Defendant's Proposed Findings of Fact and Conclusions of Law
as to Plaintiffs' Count VII (ERISA Breach of Fiduciary Duty)

*Trull, et al. v. Dayco Prods., LLC, et al.*
Case No. 1:02-cv-243

Case 1:02-cv-00243-LHT   Document 140   Filed 07/07/04   Page 9 of 11

51.     Moreover, even if Mark IV had been able to find a lower cost provider, that would not mean that it was unreasonable to stay with UHC.  Instead, it would be necessary to consider other factors such as the preferences of the participants, the ability to duplicate the provider network and the quality of services.  Each of these factors support Mark IV's decision to stay with UHC.

52.     With respect to the issue of bad faith, the evidence shows that Mark IV has undertaken a variety of steps to lower costs, including the manner in which it has calculated the family cost caps, its efforts to obtain a lower cost drug provider, its efforts to negotiate a three-tier rate system, its investigation of "Medicare risk" HMO coverage, it's offering of the "Silver Care" option, and its RFP with respect to the drug program.  These efforts to keep costs low are totally inconsistent with the idea that Mark IV was attempting to keep costs high so that people would drop their coverage.

53.     Finally, for the reasons previously stated, there is absolutely no evidence that Plaintiffs have been "prejudiced" by the fact that Mark IV renewed its contracts without requesting backup data.  On the contrary, all of the evidence is to the contrary.

Defendant's Proposed Findings of Fact and Conclusions of Law
as to Plaintiffs' Count VII (ERISA Breach of Fiduciary Duty)

*Trull, et al. v. Dayco Prods., LLC, et al.*
Case No. 1:02-cv-243

# IV.    CONCLUSION

54.    Based on all of the foregoing, the Court finds in favor of Defendants with respect to Count VII.

Dated: July 6, 2004

/s/ Neal Ellis, Jr.
Hunton & Williams
One Hannover Square, Suite 1400
421 Fayetteville Street Mall
Raleigh, North Carolina 27601
(919) 899-3000

John W. Allen (P10120)
David E. Khorey (P37089)
Joseph J. Vogan (P29920)
Anthony R. Comden (P44958)
Varnum, Riddering, Schmidt & Howlett, LLP
Bridgewater Place, P.O. Box 352
333 Bridge Street, N.W.
Grand Rapids, Michigan 49501-0352
(616) 336-6000
(616) 336-7000 – fax

Attorneys for Defendants

1006820_2

11

Defendant's Proposed Findings of Fact and Conclusions of Law
as to Plaintiffs' Count VII (ERISA Breach of Fiduciary Duty)

*Trull, et al. v. Dayco Prods., LLC, et al.*
Case No. 1:02-cv-243

Case 1:02-cv-00243-LHT    Document 140    Filed 07/07/04    Page 11 of 11